1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| KIC, LLC, a Delaware Limited Liability Company,<br><br>                    Plaintiff,<br><br>       v.<br><br>ZHEJIANG DICASTAL HONGXIN TECHNOLOGY Co., LTD., a Chinese Corporation,<br><br>                    Defendant. | CASE NO. 3:19-cv-05660-RJB<br><br>ORDER GRANTING IN PART AND DENYING IN PART KIC'S MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART HONGXIN'S MOTION FOR SUMMARY JUDGMENT |

This matter comes before the Court on KIC, LLC's ("KIC") Motion for Summary Judgment (Dkt. 87-sealed; Dkt. 88-same, sealed; and Dkt. 89-unsealed, redacted) and Zhejiang Dicastal Hongxin Technology Co., Ltd.'s ("Hongxin") Motion for Partial Summary Judgment (Dkt. 92). The Court has considered the pleadings filed in support of and in opposition to the motions and the file herein. The Parties request oral argument, but that is unnecessary to fairly decide these motions.

1    In March 2013, Plaintiff KIC, a commercial truck part designer and distributor, entered

2    into a contractual relationship with Defendant and Counterclaimant Hongxin, a wheel

3    manufacturer, in which KIC would purchase aluminum wheels from Hongxin.  The Parties

4    signed a distribution agreement ("Distribution Agreement"), which included both an exclusivity

5    provision and a provision regulating the price at which Hongxin could sell to customers in

6    Mexico, and a confidentiality agreement ("Confidentiality Agreement").

7    KIC alleges that Hongxin breached both agreements by selling to customers prohibited

8    by the exclusivity provision and to customers in Mexico at a price below the contractual

9    minimum.  Hongxin counterclaims for breach of contract for failure to pay for ten container

10    shipments of aluminum wheels and for failure to grant price adjustments required by the

11    Distribution Agreement.

12    For the following reasons, both motions should be granted in part and denied in part.

## I.    RELEVANT FACTS AND PROCEDURAL HISTORY

### A.  THE CONTRACTS

#### 1.  The Distribution Agreement

On March 13, 2013, KIC and Hongxin entered into the Distribution Agreement "for the

purpose of establishing a distribution relationship between Manufacturer [Hongxin] and

Distributor [KIC] of Aluminum wheels for north American market."  Dkt. 90-3 at 1.  The

relevant provisions are listed below.

**Section 2**, the exclusivity provision, reads:

**Exclusivity in North America**

Distributor [KIC], its agents or assignees shall have the exclusive right to
purchase the Products from Manufacturer [Hongxin] and sell the same to its already
existing list of OEM and aftermarket customers, as listed in Appendix A, in
exclusive territory defined as United States.  Manufacturer's customers, neither

Manufacturer nor any agent, subsidiary, or affiliate of Manufacturer, shall sell, supply, or otherwise provide the Products destined for shipment to exclusive territory to anyone other than Distributor.  Manufacturer shall prohibit and prevent its employees, agents, subsidiaries or affiliates from manufacturing or selling Products to any third person.   This agreement excludes customers that Manufacturer was already supplying aluminum wheels to in North America prior to the date of this agreement.  A list of these customers is included in Appendix B in this agreement.  The Products are to be branded with the Distributor's name. Manufacturer agrees not to offer, to sell to or to accept orders from the customers listed in Appendix A or any other future KIC customers directly or indirectly.

Dkt. 91-3 at 1.

**Appendix A** is extensive and will not be listed here, except to note that it includes a company called FleetPride.  *Id.* at 3; Dkt. 90-10.

**Appendix B** is much shorter, and it reads, in full:

**"Appendix B – Hongxin's Existing Customer List: USA**

- PACCAR
- DRAGON"

Dkt. 91-3 at 7.

**Section 4** regulates the price and includes two relevant provisions.  First, it sets the price at which aluminum wheels shall be sold between the companies:

Pricing will be subject to quarterly price adjustment mechanism governed by fluctuations in aluminum pricing and currency exchange rates.  Pricing will be adjusted if the fluctuation in aluminum pricing combined with the exchange rate fluctuation exceeds 3% … Quarterly price adjustments will be reviewed and communicated 30 days prior to the beginning of the next quarter.

Second, it sets the price at which Hongxin may sell wheels to companies in Mexico and Canada:

[Hongxin] will grant Distributor a 10% price advantage over other customers in North American territory where exclusivity is currently not granted (Mexico and Canada).  Pricing will be subject to a quarterly price adjustment mechanism governed by fluctuations in aluminum pricing and currency exchange rates.

Dkt. 91-3 at 2.

**Section 12** regulates payment between the Parties, and it reads: "Distributor shall make payment to Manufacturer in a mutually agreed manner specified in the purchase order or other documents submitted by the Distributor for each order of Products." Dkt. 91-3 at 4.

**Section 13** regulates KIC's remedies in the event of Hongxin's breach.  It provides:

**Owner's Remedies**

In the event of any breach of this Agreement by Manufacturer, then with respect to certain specific violations of this Agreement the remedies available to Distributor shall be as follows:

    (a) If Manufacturer violates Distributor's exclusive rights to the Products by selling the Products to any person other than Distributor, then in addition to any other remedies Distributor shall be entitled to collect royalties at the rate of 15 percent of the sales price or any other form of proceeds received by Manufacturer, its agents, subsidiaries, or affiliates from the sale or other transfer of any products or product rights in violation of Distributor's exclusive rights to the Products.

Dkt. 91-3 at 4.

**Section 17**, the incorporation provision, reads:

**Entire Agreement**

This Agreement, together with its exhibits and attachments, constitute the entire agreement between the parties and merges with and supersedes any prior understanding or agreement, whether written or oral.  This Agreement may be amended only by a written document signed by both parties.

If any of the terms of this Agreement conflict or are inconsistent with any of the attached exhibits and attachments or other documents delivered by one party to the other hereunder, the terms of this Agreement will control, except that if any of the purchase on any purchase order from Distributor, the terms of the purchase order will control.

*Id.* at 5.

### 2.  Emails about the Distribution Agreement

The following are relevant emails discussing the Distribution Agreement.

While internally discussing drafting the Distribution Agreement, a KIC representative wrote, "[i]t does not work to have a 'deal-by-deal' agreement.  We can carve out their current customers but we need the rest of the market.  Maybe they give us exclusivity (except for their

ORDER GRANTING IN PART AND DENYING IN PART KIC'S MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART HONGXIN'S MOTION FOR SUMMARY JUDGMENT - 4

current customers) and then give us a trial period to see what we can generate for them." Dkt.

95-8 at 2.

On March 5, 2013, the same KIC representative wrote:

> The following is what I negotiated with Hongxin . . . Exclusivity for USA for KIC is for Navistar and the list of current KIC OEM and aftermarket customers excluding Hongxin's already existing USA customers which are only two: Paccar and Dragon.  Outside of the list and Navistar, they can sell direct.
> Please start writing the list of customers that we want to add to the exclusivity clause.  We need to do this ASAP.

Dkt. 90-5 at 2.

On March 13, 2013, the day the Parties signed the Agreements, a representative from

KIC wrote the following to Hongxin:

> Please review the revised agreement and return a signed copy to us for our counter-signature and records.  We understand from your discussions with Dr. Omar that you are already working with KARL in Canada and two other customers in Mexico, so KIC is willing to forego exclusivity in those two locations at this point.  We do, however, request that you protect KIC's market position by selling to others in these two countries at a price at minimum 10% above your price to KIC.

Dkt. 91-4 at 1.

On March 5, 2015, two years into the agreement, the Parties emailed about Mid-America

Truck Show, an upcoming trade show.  A representative from KIC wrote:

> We are looking forward to meeting with you and your team during the upcoming Mid-America Truck Show to discuss new opportunities and the expansion of our partnership.
> In order to avoid confusion among customers, we would like to suggest that you display your own wheels only in your booth but do not include a KIC-branded wheel.  KIC will in turn display the KIC-branded wheel in our booth.
> When you receive inquiries from North American customers at your booth, please direct them to KIC for follow-up.
> We believe this will best allow us to service our market without your support while honoring our agreement about KIC's exclusivity in North America and your commitment to your existing customers.

Dkt. 90-20 at 1–2.

A representative from Hongxin responded: "Thanks for KIC nice understanding.

ORDER GRANTING IN PART AND DENYING IN PART KIC'S MOTION FOR SUMMARY JUDGMENT
AND GRANTING IN PART AND DENYING IN PART HONGXIN'S MOTION FOR SUMMARY JUDGMENT
- 5

Sure we will not show any KIC brand in our booth, pls inform us your booth No. then we will

inform american customer that go to your booth as our distributor in USA. thanks." *Id.*

### 3. The Confidentiality Agreement

On March 12, 2013, the Parties signed the Confidentiality Agreement.  Dkt. 89 at 7.  In it,

the Parties agreed not to "disclose, disseminate, publish or otherwise reveal any

CONFIDENTIAL INFORMATION to anyone except on a strict need to know basis."  Dkt. 90-1

at 2.

The Confidentiality Agreement reads, in part, with pertinent provisions emphasized:

1. For the purposes of this Agreement, <u>CONFIDENTIAL INFORMATION shall mean any **information, technical data or know-how** relating to matters including, but not limited to, research, products,</u> software, services, development, inventions, specifications, techniques, manuals, formulations, details of plant and processes, designs, drawings, engineering, operating methods and instructions, marketing strategies and analysis, projections, plans, financial information, reports, and the like, disclosed by the Disclosing Party, directly or indirectly or whether disclosed prior to or subsequent to the effective date of this Agreement to the Receiving Party.
   a) CONFIDENTIAL INFORMATION shall also include all negotiations with respect to any contemplated transaction between the parties and the existence and terms of this Agreement.
   b) <u>The Receiving Party shall have a duty to protect only CONFIDENTIAL INFORMATION (i) which is disclosed by the Disclosing Party in writing and is marked as "CONFIDENTIAL" (or comparable legend) at the time of disclosure; or (ii) which is disclosed by the Disclosing Party in any other manner and is designated as confidential in a written memorandum delivered to the Receiving Party within ten (10) days of the disclosure.</u>
   c) Any reproductions, notes, summaries or similar documents restating to CONFIDENTIAL INFORMATION shall itself be CONFIDENTIAL INFORMATION and as such shall become and remain the Disclosing Party's property upon the creation and shall be conspicuously marked as "Confidential" (or comparable legend).
   d) Any customer or market information shall be CONFIDENTIAL INFORMATION.
   e) Neither Party shall identify information as CONFIDENTIAL INFORMATION unless it in good faith believes same to be confidential, privileged, a trade secret, or entitled to such proprietary claim.

*Id.* at 1.

1    The agreement does not apply to any information "developed by the Receiving Party

2 independently of any CONFIDENTIAL INFORMATION received from the Disclosing Party."

3 *Id.* at 2.  It lasts "[f]or a period of ten (10) years from the date of this Agreement," which the

4 Parties executed on March 12, 2013.  *Id.*

5    **B.  FACTS**

6    Hongxin admits that it sold aluminum wheels to FleetPride, a company listed on

7 Appendix A but not on Appendix B, and 13 other companies that are not listed on either

8 Appendix.  Dkt. 105.  Ten companies that are based in the United States: American Pacific

9 Industries, Inc., American Racing Equipment, Inc., Bolong International Group, Inc., Factory

10 Transport, Inc., FleetPride, Love's Trucking Solutions, LLC, Marco Wheel Group, LLP, TBC

11 Corporation, TWG, and W&T International, LLC; and four that are based in Mexico:

12 Transportes Orta S.A. DE C.V., Cromadora Hermanos Pulido, Comercializadora Nimmka, and

13 Pulcro Credito.  *Id.* at 20.

14    Hongxin sold products to FleetPride in 2009, but there were no further sales until 2016.

15 *See* Dkts. 105 at 5; 115 at 6.  In 2017, KIC discovered Hongxin was selling to FleetPride.  Dkt.

16 89 at 13–14.  In an email to Hongxin dated February 5, 2017, a representative from KIC wrote:

17
18      I am just checking back with you regarding the issue of sales to Fleetpride that we
        discussed over the phone.  As we discussed, our agreement states that sales into
        KIC's territory will exclusively be made by KIC (except for your existing accounts
        Paccar and Dragon).  If sales are made without KIC's involvement, a 15% payment
19      based on sales price per piece is due to KIC.

20 *Id.* at 15.

21    A representative from Hongxin responded, in relevant part:

22      Well received your mail!
        I think there is a big misunderstanding between KIC and HX, FP is HX's customers
23      from 2009, they have long business relationship with HX . . . It's HX's fault that
        we forgot to remind or mentioned this customer before KIC to distinguish the old
24      customers as Hongxin's customers.

ORDER GRANTING IN PART AND DENYING IN PART KIC'S MOTION FOR SUMMARY JUDGMENT
AND GRANTING IN PART AND DENYING IN PART HONGXIN'S MOTION FOR SUMMARY JUDGMENT
- 7

Dkt. 90-23.

KIC continued to place orders with Hongxin: one in August 2018, another in October 2018, and finally in April 2019.  *See* Dkts. 92 at 21; 20 at 11.  KIC admits that it did not pay for ten container shipments from those orders.

On July 18, 2019, Hongxin removed the state court action to this court.

## C.  PENDING MOTIONS

The first motion at issue is KIC's motion for summary judgment on all claims.  Dkt. 89. KIC brings four claims: Breach of Contract – Exclusivity; Breach of Contract – Pricing; Breach of Contract – Confidentiality; and Misappropriation of Trade Secrets.  Dkt. 17.  It argues that there is no genuine dispute of material fact that Hongxin breached the Distribution Agreement and the Confidentiality Agreement, that KIC is entitled to recover 15% of the sales price of those breaching sales, and that KIC is entitled to recover actual attorney's fees and costs under the Distribution Agreement. *Id.* at 6.  KIC also argues it is entitled to summary judgment on Hongxin's counterclaim for breach of contract.  *Id.*

In response, Hongxin moves to strike KIC's motion for failure to properly and timely serve all motion documents by the dispositive motion deadline, June 17, 2021.  Dkt. 105 at 1–2. KIC filed its motion supporting documents in the electronic filing system ("ECF") on June 17, but filed some documents under seal.  Hongxin claims it could not access those documents until KIC sent unsealed copies around noon on June 18.

The second motion at issue is Hongxin's Motion for Partial Summary Judgment.  Dkt. 92.  Hongxin moves for summary judgment on various issues.  First, Hongxin argues that it did not breach the Distribution Agreement as a matter of law.  Second, that Section 13 of the Distribution Agreement is an unenforceable penalty.  Third, that the doctrine of latches bars KIC

1   from seeking contract damages.  Fourth, that KIC breached its duty to mitigate damages.  Fifth,

2   that KIC failed to meet its burden of proof to seek damages for lost profits and loss of market

3   share.

4        Hongxin also moves for summary judgment on its counterclaims, arguing that there is no

5   genuine issue of material fact that KIC did not pay for ten container shipments of aluminum

6   wheels, and, therefore, it is entitled to full reimbursement.  Finally, Hongxin argues that there is

7   no genuine issue of material fact that KIC breached its contractual obligation to grant price

8   adjustments.

9   **D.  ORGANIZATION OF OPINION**

10       The Court will first discuss Hongxin's motion to strike, which should be denied, then the

11  motions for summary judgment.  The Order will be organized by claim, first discussing KIC's

12  claims against Hongxin, then Hongxin's affirmative defenses to those claims, and finally

13  Hongxin's counterclaims against KIC, because the issues largely overlap.

14              **II.      DISCUSSION**

15  **A.  MOTION TO STRIKE**

16       Hongxin's motion to strike should be denied because KIC's motion was timely filed in

17  the electronic filing system and Hongxin has not shown any prejudice from an approximately 12-

18  hour delay in receiving unsealed copies of the supporting documents at issue.

19       Local Civil Rule 1(a) lists the purpose of the local rules and states that they should be

20  interpreted "to promote the just efficient, speedy, and economical determination of every action

21  and proceeding."  Granting Hongxin's motion to strike is not in the interest of justice, and it

22  should be denied.

23

24

### B. SUMMARY JUDGMENT STANDARD

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt.").  Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv. Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question.  The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases.  *Anderson*, 477 U.S. at 254; *T.W. Elect. Serv. Inc.*, 809 F.2d at 630.  The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party.  The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hope that evidence can be developed at trial to support the claim.  *T.W. Elect. Serv. Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*).  Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not

1  be "presumed." *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 888-89 (1990).

2  **KIC'S CLAIMS**

3     **1.  BREACH OF CONTRACT**

4     This is a diversity case and, therefore, Washington State substantive law applies.  *Davis*

5  *v. Liberty Mut. Grp.*, 814 F. Supp. 2d 1111, 1115 (W.D. Wash. 2011).  "Under Washington State

6  law, the elements of a breach of contract claim are (1) a contract imposing a duty, (2) breach of

7  that duty, and (3) damages proximately caused by breach."  *Seattle Pac. Indus., Inc. v. S3*

8  *Holding LLC*, 831 Fed. Appx. 814, 817 (9th Cir. 2020).  "If a contract is unambiguous, summary

9  judgment is proper even if the parties dispute the legal effect of a certain provision."  *Mayer v.*

10  *Pierce Medical Bureau*, 80 Wn. App. 416, 420 (1995).  Furthermore, "[a]mbiguity will not be

11  read into a contract where it can reasonably be avoided."  *Id.* at 421.

12     The Parties do not dispute the existence of a valid contract; they dispute the duties

13  imposed by the contract.  When determining duties imposed by a contract, words and phrases

14  should not be considered in isolation.  *Moeller v. Farmers Ins. Co. of Wash.*, 173 Wn.2d 264,

15  271 (2011).  Instead, courts should consider the contract in its entirety and "attempt to give effect

16  to each provision."  *Id.* at 272 (internal quotation omitted).

17     To interpret written contracts, courts applying Washington substantive law use the

18  "context rule" instead of the common parol evidence rule.  *Berg v. Hudesman*, 115 Wn.2d 657,

19  667 (1990).  The context rule allows courts to consider extrinsic evidence to determine the

20  parties' intent when drafting the contract, regardless of whether language is ambiguous.  *Id.*

21  Under the parol evidence rule, in contrast, extrinsic evidence may only be considered if the terms

22  of the contract are ambiguous.  *Id.* at 669.  The purpose of allowing a court to consider context

23  even without ambiguity is to help understand what the specific parties intended terms to mean;

24

not to add to, modify, or contradict the terms of the written contract. *Id.* at 668–69. In the end, however, it is the written language, not the unexpressed or subjective intent of the parties, that is binding. *See Hearst Commc'n, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 503 (2005).

### a. Breach of the Distribution Agreement – Sales to U.S. Companies

Three provisions make up the crux of the exclusivity provision of the Distribution Agreement.

First, "[KIC], its agents or assignees shall have the exclusive right to purchase the Products from [Hongxin] and sell the same to its already existing list of OEM and aftermarket customers, as listed in Appendix A, in exclusive territory defined as United States." Dkt. 91-3 at 1.

Second, "[Hongxin's] customers, neither [Hongxin] nor any agent or subsidiary, or affiliate of [Hongxin], shall sell, supply, or otherwise provide the Products destined for shipment to exclusive territory to anyone other than [KIC]." *Id.*

Third, "This agreement excludes customers that [Hongxin] was already supplying aluminum wheels to in North America prior to the date of this agreement. A list of these customers is included in Appendix B in this agreement." *Id.*

The plain language of the contract unambiguously prohibits Hongxin from selling to customers in the United States other than its existing customers listed on Appendix B, Paccar and Dragon. Hongxin admits that it sold to FleetPride and nine other companies based in the United States other than Paccar and Dragon, and therefore undisputed evidence shows that Hongxin breached the Distribution Agreement.

The Distribution Agreement unambiguously prohibited Hongxin from selling to FleetPride both because it was not included on Appendix B and because it was included on

Appendix A, KIC's exclusive customers.  The phrase "a list of these customers is included on is included in Appendix B" modifies the customers Hongxin "was already supplying aluminum wheels to in North America prior to this agreement."  Hongxin argues that it did not breach the Distribution Agreement because merely failed to notify KIC that FleetPride was an existing customer and include it on Appendix B.  Such a reading would contradict the terms of the written contract.

The Distribution Agreement also prohibited Hongxin from selling to nine other companies in the United States that Hongxin admits it sold to because they were not listed on Appendix A.  Hongxin relies heavily on the first sentence of the exclusivity provision, which states that only KIC can sell to companies on Appendix A, and the context rule to argue that the Distribution Agreement only prohibited Hongxin from selling to customers explicitly listed on Appendix A.  Though perhaps unartfully drafted, the second sentence, listed above, unambiguously prohibits Hongxin from selling to anyone other than KIC.  The third sentence creates the only exception to that rule, and it permits Hongxin to sell to companies in the United States that are listed on Appendix B.  The first sentence, which states that only KIC may sell to its existing customers listed on Appendix A, does not conflict with that rule; it merely expands on it to specify who Hongxin cannot sell to.

Context does not change these unambiguous terms.  Emails between the Parties at most demonstrate ambiguity as to what they discussed or subjectively intended to include in the contract.  *See e.g.*, Dkt. 90-5 at 2 (internal email from KIC discussing contract negotiations) ("Exclusivity for USA for KIC is for Navistar and the list of current KIC OEM and aftermarket customers excluding Hongxin's already existing USA customers which are only two: Paccar and Dragon. Outside of the list and Navistar, they can sell direct."); Dkt. 91-4 at 1 (email from KIC

to Hongxin) ("we are willing to forgo exclusivity in [Canada and Mexico] at this point."). The correspondences do not create ambiguity in the plain language of the Distribution Agreement, and it cannot now be rewritten to accommodate either Party's subjective intent. Issues of fact, for example whether FleetPride can be considered an existing customer based on sales from Hongxin to FleetPride from and before 2009, are irrelevant because they cannot alter these findings as a matter of law.

Therefore, Hongxin breached the Distribution Agreement as a matter of law by selling to customers in the United States beyond the two listed in Appendix B. Accordingly, KIC should be granted summary judgment on this issue. Hongxin's motion for summary judgment, which more narrowly moved to find that the Distribution Agreement permitted it to sell to existing customers, should be denied.

**b. Breach of the Distribution Agreement – Improper Pricing to Mexican Companies**

Hongxin does not dispute that it sold aluminum wheels to companies in Mexico at a price below that required by Section 4 of the Distribution Agreement. *See* Dkt. 105.

Section 4 reads: "[Hongxin] will grant Distributor a 10% price advantage over other customers in North American territory where exclusivity is currently not granted (Mexico and Canada). Pricing will be subject to a quarterly price adjustment mechanism governed by fluctuations in aluminum pricing and currency exchange rates." Dkt. 91-3 at 2. Stated another way, this provision required Hongxin to sell aluminum wheels to companies in Mexico at a price at least 10% higher than the price paid by KIC.

Instead of disputing that prohibited sales took place, Hongxin argues that a violation of Section 4 is not subject to the 15 percent damages provision listed in Section 13. Dkt. 105 at 20.

Section 13 provides:

**<u>Owner's Remedies</u>**

In the event of any breach of this Agreement by Manufacturer, then with respect to certain specific violations of this Agreement the remedies available to Distributor shall be as follows:

(a) If Manufacturer violates Distributor's exclusive rights to the Products by selling the Products to any person other than Distributor, then in addition to any other remedies Distributor shall be entitled to collect royalties at the rate of 15 percent of the sales price or any other form of proceeds received by Manufacturer, its agents, subsidiaries, or affiliates from the sale or other transfer of any products or product rights in violation of Distributor's exclusive rights to the Products.

(b) If manufacturer's warranty is breached, Manufacturer will immediately replace the products at Manufacturer's cost and deliver the same at its expense to the site of the failed Products . . . . (not relevant to this dispute)

(c) If Manufacturer breaches any provision of this Agreement in any material way, in addition to the above remedies, Distributor shall be entitled to all other remedies under the laws of China and under international treaties of which China is a signatory, including without limitations, damages of loss of customers and reputation, and other incidental and consequential damages.

*Id.* at 4 (emphasis added).

Section 13(a), which provides the 15 percent remedy, is limited to a breach based on "selling the Products to any person other than Distributor." The Distribution Agreement permitted Hongxin to sell to companies in Mexico, so those sales do not constitute a breach based on "exclusive rights."

Therefore, there is no genuine issue of material fact that Section 13(a) does not permit recover of "royalties at the rate of 15 percent of the sales price" of sales to Mexican companies that fell below the 10 percent price advantage given to KIC. Accordingly, KIC's motion for summary judgment on this issue should be denied.

### c. Breach of the Confidentiality Agreement

KIC argues that Hongxin breached the Confidentiality Agreement because the aluminum wheels themselves were confidential information protected by the Confidentiality Agreement

ORDER GRANTING IN PART AND DENYING IN PART KIC'S MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART HONGXIN'S MOTION FOR SUMMARY JUDGMENT - 15

1    because they were the product of a collaborative effort that included using KIC's protected

2    information.  Dkt. 89 at 26; Dkt. 115 at 9.  The Parties raise questions of fact as to whether KIC

3    contributed information that led to the development of the aluminum wheel at issue.  *See* Dkts.

4    89 and 92.  These questions of fact, however, are not relevant because the Confidentiality

5    Agreement does not protect the product itself, only "information, technical data or know-how[.]"

6    Dkt. 90-1.

7            KIC vaguely alleges that Hongxin "used the Smithers laboratory testing results to

8    consummate sales into the U.S."  Dkt. 115 at 9.  While testing results could be protected

9    information or technical data relating, this vague allegation does not establish a genuine issue of

10   material fact that Hongxin breached the Confidentiality Agreement because KIC does not submit

11   any evidence that Hongxin provided the results of those tests to other parties.  *See id.*

12   Furthermore, KIC does not provide evidence that the results of those tests were designated as

13   KIC's confidential information, as required by Section 1(b).  Dkt. 90-1 at 1 ("The Receiving

14   Party shall have a duty to protect only CONFIDENTIAL INFORMATION (i) which is . . .

15   marked as 'CONFIDENTIAL' (or comparable legend) at the time of disclosure; or (ii) which is .

16   . . identified as confidential at the time of disclosure and is also summarized and designated as

17   confidential in a written memorandum delivered to the Receiving Party within ten (10) days of

18   the disclosure.").

19           There is no evidence on the record that Hongxin provided confidential information to

20   prohibited parties.  Therefore, Hongxin did not breach the Confidentiality Agreement or

21   misappropriate trade secrets as a matter of law.

22           **2.   DAMAGES PROVISION**

23

24

1    Hongxin moves for summary judgment arguing that the damages provision contained in

2    the Distribution Agreement is an unenforceable penalty.

3    The damages provision, Section 13, reads: "If [Hongxin] violates [KIC's] exclusive

4    rights to the Products by selling the Products to any person other than Distributor, then in

5    addition to any other remedies [KIC] shall be entitled to collect royalties at the rate of 15 percent

6    of the sales price. . . ." Dkt. 91-3 at 4.

7    The parties first dispute whether this section entitles KIC to "royalty," which is how it is

8    labeled.  The 15 percent provision is not technically a royalty.  The "ordinary, everyday senses"

9    of the word royalty is "a share of the product or profit reserved by the grantor . . . a payment

10   made to an author or composer for each copy of his work sold or to an inventor for each article

11   sold under a patent." *Sierra Club Inc. v. C.I.R.*, 86 F.3d 1526, 1531 (9th Cir. 1996) (quoting

12   *Webster's Ninth New Collegiate Dictionary* 1028 (1984)).

13   A more comprehensive definition is:

14   Compensation for the use of property, usually copyrighted material or natural
     resources, expressed as a percentage of receipts from using the property or as an
15   account per unit produced.  A payment which is made to an author or composer by
     an assignee, licensee or copyright holder in respect for each copy of his work which
16   is sold, or to an inventor in respect for each article sold under the patent.  Royalty
     is share of product or profit reserved by owner for per permitting another to use the
17   property.

18   *Id.* (quoting *Black's Law Dictionary* 1330–31 (6th Ed. 1979)).

19   KIC does appear to have any ownership rights to the wheel or wheel design at issue that

20   would entitle it to a royalty payment.  Section 13 is, however, an enforceable liquidated damages

21   provision.

22   Under Washington law, a liquidated damages provision is enforceable, but a penalty is

23   not. *Watson v. Ingram*, 124 Wn.2d 845, 850 (1994).  Liquidated damages are acceptable, and

24   often favored, in part because courts recognized that calculating actual damages can be difficult

1   and because parties have a general right to contract as they feel is reasonable. *See id.* at 852

2   ("we are loathe to interfere with the rights of parties to contract as they please between

3   themselves"); *see also Walter Implement v. Focht*, 107 Wn.2d 553, 560 (1987) (emphasizing that

4   damages for violation of a non-compete agreement are often difficult to ascertain); *Perry v.*

5   *Moran*, 111 Wn.2d 885, 887 (1989) (same). Therefore, a liquidated damages clause is

6   enforceable if (1) it is a reasonable forecast of just compensation for the harm caused by the

7   breach of contract, and (2) actual damages are difficult to calculate. *Watson*, 124 Wn.2d at 850.

8       In contrast, "a penalty is a sum inserted in a contract, not as the measure of compensation

9   for its breach, but rather as punishment for default." *Kettner v. Buchanan*, 97 Wn. App. 370, 373

10  (1999) (internal quotation omitted). Generally, a penalty would allow the non-breaching party to

11  recover a sum clearly more than actual damages, either because the sum is unreasonably high or

12  because actual damages can be accounted for and the contract allows the non-breaching party to

13  recover actual damages plus an additional sum. *See Walter Implement*, 107 Wn.2d at 560;

14  *Pheonix N.W. Constr. v. Gregerson Custom Homes, Inc.*, 131 Wn. App. 1016 (2006) (recovery

15  for actual construction costs plus a 15 percent markup is a penalty).

16      Actual damages caused by breach of the Distribution Agreement would be difficult to

17  calculate. Like a non-compete agreement, specifying the measure of actual damages created by

18  Hongxin's breach would be difficult because determining what KIC's sales would have been

19  without the breach is speculative. There is no evidence that recovery of 15 percent in addition to

20  the sale price would allow KIC to recover a sum clearly more than actual damages, and it would

21  certainly not allow recovery of actual damages plus an additional sum because actual damages

22  are speculative.

23

24

ORDER GRANTING IN PART AND DENYING IN PART KIC'S MOTION FOR SUMMARY JUDGMENT
AND GRANTING IN PART AND DENYING IN PART HONGXIN'S MOTION FOR SUMMARY JUDGMENT
- 18

1    Therefore, there is no question of fact that the 15 percent damages provision is reasonable

2    and enforceable.  KIC's motion for summary judgment on this issue should be granted, and

3    Hongxin's motion on this issue should be denied.

4    **C. AFFIRMATIVE DEFENSES**

5    Hongxin argues that the doctrine of laches and the duty to mitigate damages bar or limit KIC

6    from recovering damages.  For the following reasons, neither laches, nor the duty to mitigate

7    damages should apply.

8    **1. LACHES**

9    Laches is an equitable defense that bars recovery for a past legal wrong based on

10   principles of estoppel.  *Newport Yacht Basin Ass'n Condo. Owners v. Supreme Nw., Inc.*, 168

11   Wn.App 56, 76 (2012).  It requires the defendant to affirmatively establish that (1) the plaintiff

12   knew, or had a reasonable opportunity to discovery a potential cause of action against the

13   defendant; (2) the plaintiff  unreasonably delayed commencing the action; and (3) the

14   unreasonable delay materially prejudiced the defendant.  *See id.*; *Buell v. City of Bremerton*, 80

15   Wn.2d 518, 522 (1972).  "However, laches is an extraordinary remedy that should not, under

16   ordinary circumstances, be employed to bar an action short of the applicable statute of

17   limitations." *Harmony at Madison Park Owners Ass'n v. Madison Harmony Dev., Inc.*, 143

18   Wn.App. 345, 362 (2008).

19   Hongxin does not demonstrate extraordinary circumstances to justify application of

20   laches.  Although KIC may have known or reasonably should have known that Hongxin

21   breached the Distribution Agreement by February 2017, there is no evidence that KIC

22   unreasonably delayed filing a lawsuit.  Communications suggest that, at least for a time, the

23   Parties attempted to resolve their issues out of court.  Dkt. 92 at 7 ("In 2019, the parties did

24

ORDER GRANTING IN PART AND DENYING IN PART KIC'S MOTION FOR SUMMARY JUDGMENT
AND GRANTING IN PART AND DENYING IN PART HONGXIN'S MOTION FOR SUMMARY JUDGMENT
- 19

1   attempt to resolve their dispute . . . However, the parties were unable to settle the issue."); Dkt.

2   93-1 at 3 ("I know it's a little embarrass between HX and KIC team now due to the 2013

3   agreement issue. We believe that we will find the way to solve that issue soon in peaceful

4   way.").  Attempts to resolve issues outside of court are a reasonable cause for delay.

5        No reasonably jury could find that KIC unreasonably delayed filing its lawsuit, and

6   Hongxin's motion for summary judgment on this issue should be denied.

7        **2.   FAILURE TO MITIGATE**

8        Similarly, Hongxin does not demonstrate that KIC failed to mitigate damages.

9        The duty to mitigate damages "prevents recovery for those damages the injured party

10  could have avoided by reasonable efforts taken after the wrong was committed." *Bernsen v. Big*

11  *Bend Elec. Coop., Inc.*, 68 Wn. App. 427, 433 (1993).

12       Hongxin does provide evidence of reasonable efforts KIC could have taken to mitigate

13  damages.  KIC asked Hongxin to stop selling to FleetPride, but Hongxin claimed that those sales

14  did not breach of the Distribution Agreement.  KIC's duty to mitigate damages does not create a

15  duty to prevent Hongxin from breaching their agreement.

16       Hongxin's motion for summary judgement on this issue should be denied.

17  **D.  HONGXIN'S COUNTERCLAIM FOR BREACH OF CONTRACT**

18      **1.   FAILURE TO PAY FOR SHIPMENTS**

19       KIC's failure to pay Hongxin for ten container shipments was acceptable under the terms

20  of the applicable purchase orders.

21       The purchase orders that KIC did not pay for include a provision that reads " Purchaser

22  [KIC] will be entitled to set off any amount owing from Seller [Hongxin] to Purchaser [KIC] or

23  its affiliates against any amount payable by Purchaser [KIC] under this order."  Dkt. 90-30 at 9.

24

1    Though Section 17 of the Distribution Agreement makes clear that it is a fully integrated

2    agreement, under Section 12 "Distributor [KIC] shall make payment to Manufacturer [Hongxin]

3    in a mutually agreed manner specified in the purchase order. . . ."

4         In sum, the purchase order permits KIC's payment to be offset by any amount owed to

5    KIC by Hongxin, and the Distribution Agreement permits the purchase order to set the means of

6    payment.  Therefore, there is no genuine question of material fact that the purchase order

7    permitted KIC not to pay for purchase orders to offset money owed to it by Hongxin.

8         Hongxin argues in the alternative that KIC breached the implied covenant of good faith

9    and fair dealing by not paying for those purchase orders, but this argument also fails.  "The

10   implied covenant of good faith and fair dealing cannot add or contradict express contract terms

11   and does not impose a free-floating obligation of good faith on the parties." *Rekhter v. State,*

12   *Dept. of Soc. and Health Serv.*, 180 Wn.2d 102 (2014).  Nonpayment as an offset to money owed

13   is explicitly permitted by the purchase order.  The covenant of good faith and fair dealing cannot

14   contradict that.

15        Therefore, KIC's motion for summary judgment on this issue should be granted, and

16   Hongxin's motion should be denied.

17        **2.   FAILURE TO GRANT PRICE ADJUSTMENTS**

18        KIC is, however, required to grant mandatory price adjustments.

19        Section 4 (Price) reads: "Pricing <u>will</u> be adjusted if the fluctuation in aluminum pricing

20   combined with the exchange rate fluctuation exceeds 3%."  Dkt. 91-3 at 2 (emphasis added).

21   The word "will" makes pricing adjustment mandatory.

22

23

24

1    Though the terms of the purchase order entitle the Purchaser "to set off any amount

2    owing from Seller to Purchaser," it does not permit the Purchaser, KIC, to deny the mandatory

3    price adjustments.

4    KIC does not dispute that there was a fluctuation in aluminum pricing and exchange rate

5    that exceeded 3 percent, or that Hongxin requested price adjustments.  Dkt. 115 at 10.  Instead, it

6    argues that the terms of the individual purchase order govern the price, and Hongxin accepted

7    KIC's offered price despite the offer not including a price adjustment.  *Id.*  Though KIC can

8    offset payment for purchase orders out of the total amount Hongxin owes to it for breach, the

9    price of the purchase order must include an adjustment accounting for the fluctuation in the price

10   of aluminum combined with the exchange rate.

11   Therefore, KIC should be denied and Hongxin should be granted summary judgment on

12   this issue.

13   **E.  CONCLUSION**

14   For the reasons listed above, Hongxin breached the Distribution Agreement as a matter of

15   law, and neither laches, nor the duty to mitigate damages apply.  Hongxin did not violate the

16   Confidentiality Agreement.  KIC was entitled to offset damages by not paying for purchase

17   orders, but it was required to grant price adjustments for the price of those orders when the

18   fluctuation in aluminum pricing combined with the exchange rate fluctuation exceeded 3 percent.

19   This Order, however, does not resolve the question of damages.

20

21

22

23

24

1

### III.   ORDER

2
Therefore, it is hereby **ORDERED** that:

3
- KIC's Motion for Summary Judgment (Dkt. 87, 88, and 89) **IS GRANTED IN**

4
  **PART AND DENIED IN PART**;

5
- Hongxin's Motion for Partial Summary Judgment (Dkt. 92) **IS GRANTED IN**

6
  **PART AND DENIED IN PART**;

7
- The Parties shall submit additional briefing on the issue of damages as follows:

8
  - Each Party shall submit a motion on damages consistent with this Order

9
    by **September 22, 2021**;

10
  - Each Party may respond to the opposing Party's motion on damages by

11
    **September 29, 2021**;

12
  - Neither Party may submit a reply unless otherwise ordered;

13
- The pending motions in limine (Dkt. 112), the pretrial conference, and the trial

14
  date **ARE STRICKEN** to be renoted, if necessary, after considering the

15
  briefing on damages.

16
The Clerk is directed to send uncertified copies of this Order to all counsel of record and

17
to any party appearing pro se at said party's last known address.

18
Dated this 30th day of August, 2021.

19

20
ROBERT J. BRYAN
United States District Judge

21

22

23

24